IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ADAM WAZNY, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 17 C 6871 |
| CITY OF CHICAGO and RALPH EGAN, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Adam Wazny, a Chicago police officer, sued the City of Chicago and Sergeant Ralph Egan for discrimination in violation of Title VII and the United States Constitution's Fourteenth Amendment. Wazny alleges that he was subjected to employment discrimination that amounted to a hostile work environment because of his Polish national origin. The defendants have moved for summary judgment.

### Background

The following facts are undisputed except where otherwise noted. Adam Wazny was born in Poland. He immigrated to the United States with his parents and siblings in the mid-1990s. Although he has lived in the United States for most of his life, Wazny speaks English with an accent.

Wazny joined the Chicago police department in 2003. In 2009, after working in several roles including as a beat officer, he transferred to the department's vice section, which is made up of about fifty officers divided into smaller specialized teams of eight to

ten.  Wazny joined the violence reduction team, a unit of plainclothes officers whose work includes undercover assignments.  Wazny did not have any problems on the team for the first several years he served on it.

In April 2014, Sergeant Ralph Egan was assigned to a leadership position in the violence reduction team.  Wazny and Egan soon butted heads.  At the core of this suit is the parties' disagreement about the cause of their conflict.  Wazny testified during his deposition that Egan treated him differently from other officers.  He quickly came to believe that he was being singled out because of his accent and Polish national origin.  Wazny testifies that he was subjected to explicitly discriminatory treatment, including near-daily derisive comments about his accent, regular jokes about Polish people, and a comment about the Polish music to which he listened.  He also describes a pattern of subtler mistreatment.  Among other incidents, Wazny says that Egan regularly joked that Wazny was stupid or intellectually disabled, spoke to him slowly as one might speak to a small child or a person with limited English proficiency, subjected him to disproportionate and humiliating comments when he made small errors in the course of his work, and singled him out for eating at work despite many other officers doing the same.  Wazny also recounts several specific incidents during which he says Egan became inexplicably angry at him.  According to Wazny, such incidents occurred in May 2015, September 2015, March 2016, and June 2016.  On June 7, 2016, for instance, Wazny apparently asked Egan whether he had completed a report that was newly required by the department to document arrests.  Egan, who was driving the squad car in which the two men were riding, became furious and started driving erratically.

The defendants acknowledge that Egan could be a gruff boss.  Indeed, they even

2

admit that on several occasions Egan became very angry at Wazny. But they contend that the disputes were not based on any sort of discriminatory animus. Rather, in their telling, Egan became frustrated with Wazny because he often failed to satisfy the requirements of his job. The defendants point to times when Wazny came to work late, failed to follow instructions, or fell below productivity requirements. The defendants claim that Egan acted similarly toward another officer, Ron Walker, who is not Polish. Regarding jokes about Wazny's Polish heritage, they note that during his deposition Wazny himself admitted to participating in a workplace culture in which officers regularly made jokes about one another's backgrounds. Finally, the defendants emphasize that several of Wazny's coworkers were descendants of Polish immigrants and did not report feeling discriminated against—though the defendants admit that all such peers were raised in the United States and thus did not share Wazny's accent or other characteristics.

Wazny sought to get away from Egan. Even before the June 7, 2016 episode, Wazny was working behind the scenes to get reassigned to a different team. On March 25, he met with Vice Lieutenant Patrick O'Malley, Egan's direct superior, told him that he and Egan had irreconcilable differences, and asked to be reassigned. Notably, Wazny did not mention during his conversation with O'Malley any of the overtly national origin-based mistreatment he now testifies that he endured. Nevertheless, O'Malley said that he would try to move Wazny to a different team in the near future. When Wazny followed up a couple of times in the following weeks, O'Malley told him to be patient.

After the June 7 dispute, Wazny had had enough. On Wednesday, June 8, he

called O'Malley on the phone and again asked to be moved away from Egan.  This time, however, Wazny used the phrase "hostile work environment" to describe his complaint, though he again omitted any mention of mistreatment specifically based on his national origin.  Wazny testified during his deposition that O'Malley was initially short with him, directing him to draft a formal memo describing the facts underlying his allegation.  Less than an hour after this initial phone call, however, O'Malley called Wazny back and told him that there was another option; Wazny did not have to draft the formal memo if he did not want to and O'Malley would get him reassigned to a newly formed summer mobile force in the coming weeks.  Wazny stated that he preferred to pursue that option.

But circumstances moved faster than anticipated.  The following weekend—Friday, June 10 and Saturday, June 11—Wazny was assigned to work in an area of the city that had experienced a spike in crime.  Wazny and his partner were apparently far less productive than Egan would have liked, writing only a single parking ticket during the two-day period.  As a result, Egan commenced a discipline process called a summary punishment action request (SPAR) against Wazny.  O'Malley was informed of the SPAR and apparently deemed it necessary to immediately intervene.  In consultation with police Commander Ken Angarone, O'Malley cancelled the SPAR and reassigned Wazny, effective June 11, to work on the vice unit's prostitution team, which was led by Sergeant Blackman.

According to Wazny, the reassignment was generally successful.  His experience with Blackman was good, and he thought that he was treated fairly.  But Wazny also testified that Egan's harassment continued in small ways.  He says that Blackman's

4

team worked during the same hours as Egan's, so he still occasionally saw Egan in the hallways. When Wazny crossed paths with Egan around their shared office space, he testified, Egan would smirk at him or say something mockingly. And, on a couple of occasions when Blackman had time off, Wazny was once against forced to work with Egan. The one specific example to which Wazny points is the Chicago LGBTQ pride parade, which occurred on June 24. Egan led the police roll call before the event, during which he told officers to avoid taking actions or saying things during the event that might be offensive. According to Wazny, Egan said "most of you are capable of doing it or are smart enough to do it, you know, except one or two of you," Wazny Dep., Ex. A to Defs.' L.R. 56.1 Stmt., at 183:1-3, after which he looked directly at Wazny. Wazny perceived this remark as a dig at him. Wazny also says that Egan threw a paycheck stub at him in August 2016.

Wazny further claims that Egan's mistreatment continued through his annual performance evaluation. Specifically, in July 2016—the month after Wazny joined Blackman's team—Egan submitted a performance evaluation that rated Wazny as "requires improvement." In each of the preceding years, Wazny had received "meets expectations" or "exceeds expectations" ratings. Perhaps recognizing that the conflict between Egan and Wazny might color the evaluation's reliability, Commander Angarone "froze" it, preventing it from becoming final.

Wazny filed an official complaint with the Chicago police department's office of legal affairs alleging national origin discrimination in August 2016. His charges with the Equal Employment Opportunity Commission (EEOC) and Illinois Department of Human Rights (IDHR) soon followed. Wazny received a right-to-sue letter in July 2017 and filed

5

this lawsuit in September. The complaint contained four counts. After the Court granted the defendants' motion to dismiss in part, *see* dkt. no. 21, two remain: count 1, in which Wazny alleges employment discrimination under Title VII against the City; and count 2, in which he alleges violations of his equal protection rights under the Fourteenth Amendment and 42 U.S.C. § 1983 against Egan.

Apparently also in September 2017—though the record is a bit muddled—Wazny learned that Blackman, the sergeant with whom he was then working on the prostitution team, intended to take a significant furlough. Wazny reached out to the office of legal affairs again to register his concern about the possibility of being reassigned to Egan's team. Sergeant Robert Flores, who was handling Wazny's IDHR charge, proposed that he could change shifts to work on the violence reduction team during the day instead. Wazny agreed and was reassigned the very next day. At the time of his deposition in June 2018 he reported that his experience on that team and shift had been positive.

## Discussion

The defendants have moved for summary judgment on the remaining claims. Summary judgment is appropriate where a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At this stage, "[a]ll justifiable inferences are drawn in favor of the non-moving party." *Giles v. Godinez*, 914 F.3d 1040, 1048 (7th Cir. 2019) (citing *Anderson*, 477 U.S. at 255). "The non-movant must, however, present specific facts establishing a material issue for trial, and any inferences must rely

6

on more than mere speculation or conjecture." *Id.* (citation omitted).

Wazny's surviving claims allege that he was subjected to a hostile work environment amounting to discrimination under Title VII and the Fourteenth Amendment. To prevail on his Title VII claim, Wazny "must show that (1) [he was] subject to unwelcome harassment; (2) the harassment was based on [his protected characteristic]; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018).

"When a plaintiff uses § 1983 as a parallel remedy to a Title VII hostile work environment claim," the elements necessary to prove the claims largely overlap. *See Alamo v. Bliss*, 864 F.3d 541, 548 n.16 (7th Cir. 2017). But there is one distinction that proves important in this case: "[i]Individual people who are agents of the employer cannot be sued as employers under Title VII. Under § 1983, however, individuals may be liable." *Passananti v. Cook County*, 689 F.3d 655, 662 n.4 (7th Cir. 2012). Here, Wazny's first claim is against the City (his employer) but the second names Egan as an individual. Because section 1983 permits liability against an individual defendant, Wazny need not show a basis for employer liability to survive summary judgment on his section 1983 claim against Egan so long as he can demonstrate that Egan acted "under color of law," 42 U.S.C. § 1983; *see also Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019), and with "sufficient personal responsibility," *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) (internal quotation marks omitted).

A.    Title VII claim against the City

Count 1 alleges that the City discriminated against Wazny by permitting Egan to create a hostile work environment.  The Court need not address the first three elements of the claim as articulated in *Johnson* because Wazny has not produced evidence from which a reasonable jury could conclude that there is a basis for employer liability against the City.

To determine whether there is a basis for employer liability, the Court must determine first "whether the alleged harassment was perpetrated by supervisors or coworkers." *Vance v. Ball State Univ.* (*Vance I*), 646 F.3d 461, 469 (7th Cir. 2011), *aff'd*, 570 U.S. 421.  If Egan was Wazny's supervisor, then the City "is strictly liable for his harassment," subject to certain affirmative defenses.  *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 930 (7th Cir. 2017); *see also Vance v. Ball State Univ.* (*Vance II*), 570 U.S. 421, 428 (2013) (describing affirmative defenses).  But if Egan was merely a coworker, the City "is liable only if it was negligent either in discovering or remedying the harassment."[1]  *Nischan*, 865 F.3d at 930 (internal quotation marks omitted).  The Supreme Court has explained that the controlling definition of a supervisor for the purposes of Title VII is an employee "empowered . . . to take tangible employment actions against the victim, i.e., to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance,* 570 U.S. at 431 (internal quotation marks omitted).

---

[1] Whether Egan was a supervisor is also relevant to the Court's analysis of the severity or pervasiveness of the alleged harassment.  *See Gates v. Bd. of Educ. of City of Chi.*, 915 F.3d 631, 638 (7th Cir. 2019).

Under the controlling definition from *Vance*, no reasonable jury could find that Egan was Wazny's supervisor. Notably, Wazny admitted in his response to the defendants' Local Rule 56.1 statement that police sergeants like Egan do not possess power to hire, fire, promote, demote, or transfer officers with whom they work.[2] Without such authority, Egan simply does not qualify as a supervisor. *See Hespe v. City of Chicago*, 307 F. Supp. 3d 874, 883 (N.D. Ill. 2018) (assessing the sergeant position in the Chicago Police Department).

The Court must therefore assess whether Wazny has produced evidence from which a reasonable jury could conclude the City was negligent in its response to Wazny's complaints of a hostile work environment. *See Nischan*, 865 F.3d at 930. He has not. The uncontested record establishes that Wazny did not inform anyone with authority to act on Egan's alleged misconduct until at least March 2016. Indeed, Wazny testified that he actively sought to minimize the effects of Egan's actions to his peers and hoped to avoid going the "legal way." Wazny Dep., Ex. A to Pl.'s L.R. 56.1 Stat. of Add'l Facts, dkt. no. 56-1, at 168:18-21. When Wazny did eventually speak with O'Malley in March 2016, he initially characterized his complaints only in vague terms— he and Egan were having a clash of personalities that he believed was irreconcilable. O'Malley agreed to start the process of getting Wazny reassigned but told him to be patient. It was not until June 8, 2016 that Wazny actually told O'Malley that he believed he was being subjected to a hostile work environment. Even then, he did not

---

[2] The parties dispute, however, whether sergeants have authority to discipline their subordinate officers. In any case, sergeants' discipline decisions are clearly subject to review by superior officers, as evidenced by Angarone's intercession into the SPAR initiated by Egan against Wazny in June 2016.

9

specifically mention that he thought the mistreatment was on the basis of his national origin. Still, O'Malley acted quickly; as soon as he saw the SPAR initiated by Egan against Wazny on June 11, he worked with Angarone to have Wazny reassigned to another team. The reassignment was finalized the very same day.

Wazny argues that the City was negligent because his formal complaint process moved more slowly. Specifically, he argues that because the official complaint that he made with the office of legal affairs did not result in an interview until September 23, 2017—about seven months after it was initially filed—the City's response was inadequate enough to subject it to liability. But no case law cited by Wazny, nor any the Court has found, suggests that whether a *formal* investigation was completed quickly upon registration of a plaintiff's complaint is alone decisive. Rather, the Court is to look to all of the circumstances of the case to determine whether a reasonable jury could find that an employer was "negligent either in discovering or remedying the harassment." *Nischan*, 865 F.3d at 931. As Wazny rightly points out, "prompt investigation of the alleged misconduct [i]s a hallmark of reasonable corrective action." *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 954 (7th Cir. 2005). The effectiveness of the remedy is also relevant to the Court's assessment. *Id.*

Here, Wazny freely admits that he kept the nature of his issues with Egan from those with power to address them for fear of being labeled a snitch. But once he did make it clear to O'Malley that he believed he faced a hostile work environment, Wazny was promptly reassigned away from Egan's team as he requested. Wazny further testified that his time on Blackman's team and on the violence reduction day-shift team has been good. In other words, the record establishes that the City's response to

Wazny's complaints was both prompt and effective. No reasonable jury could find that the City was negligent in its discovery of or response to Wazny's hostile work environment complaints.

Finally, to the extent that Wazny suggests that Egan's abuse continued after he was reassigned to Blackman's team in June 2016, those contentions are insufficient to support employer liability. The question the Court must assess at this stage is whether a reasonable jury could find that the City acted unreasonably in its efforts to address Wazny's allegations of a hostile work environment. *See Cerros*, 398 F.3d at 954. As discussed below, to demonstrate that a hostile work environment exists, a plaintiff must show either pervasive or severe mistreatment amounting to a hostile work environment. The sorts of infrequent and relatively mild slights Wazny says Egan subjected him to after his transfer to Blackman's team—a smirk in the hallway here and a tossed check stub there—simply do not amount to a hostile work environment. And the record establishes that more serious issues, like the annual performance evaluation submitted by Egan in July 2016, were effectively mediated by the City as part of its response to Wazny's complaint.

The Court concludes that no reasonable jury could find that the City's response to Wazny's complaints of a hostile work environment was unreasonable. There is thus no basis for employer liability. The City is entitled to summary judgment on count 1.

**B.    Section 1983 claim against Egan**

Wazny's claim against Egan is another matter entirely. A plaintiff may file suit under section 1983 against any individual acting under the color of state law who caused him or her to be deprived "of any rights, privileges, or immunities secured by the

11

Constitution and laws" of the United States. 42 U.S.C. § 1983. As noted, "[w]hen a plaintiff uses § 1983 as a parallel remedy to a Title VII hostile work environment claim," the elements necessary to prove the claims largely overlap. *See Alamo*, 864 F.3d at 548 n.16. To prevail, Wazny must point to evidence from which a reasonable jury could conclude that (1) he was subject to unwelcome harassment; (2) the harassment was based on his national origin; and (3) the harassment was so severe or pervasive as to alter the condition of employment and create a hostile or abusive working environment. *See id.* at 549. He must also demonstrate that Egan committed the harassment himself and under color of law. *See Spiegel*, 916 F.3d at 616; *Sanville*, 266 F.3d at 740.

1. **Wazny's affirmative case**

Egan argues that Wazny has failed to point to evidence from which a reasonable jury could conclude either that the harassment he experienced was based on his national origin or that it was severe or pervasive enough to create a hostile or abusive working environment.

The Court has little trouble rejecting Egan's first contention. As noted above, Wazny testified during his deposition that Egan subjected him to near-daily mockery of his accent, monthly jokes about his Polish heritage, and at least one comment about the Polish music to which he listened. Wazny recounted being spoken to slowly and a specific joke that Egan told that insinuated that Polish people are unintelligent. Wazny also testified that Egan regularly singled him out for criticism. For instance, the defendants admitted in their response to Wazny's Local Rule 56.1 Statement of Additional Facts that Egan "singled Wazny out for eating in the office," which was allowed and which other officers also did. Defs.' Resp. to Pl.'s L.R. 56.1 Stat., dkt. no.

12

59, at ¶ 9. And a reasonable jury could infer that at least some of Egan's regular jokes about Wazny's intelligence and the incidents during which Egan undisputedly became angry at Wazny and subjected him to verbal reprimands were based on the same discriminatory motives.

In sum, if a reasonable jury were to credit Wazny's testimony, it could conclude that Egan's harassment was based on Wazny's national origin. Egan's citation of his better treatment of other Polish American officers is also insufficient to undermine Wazny's claim. Although Egan undisputedly did not mistreat several officers of Polish heritage how he allegedly mistreated Wazny, that is immaterial regarding whether Egan mistreated Wazny in particular because of his national origin, including on the basis of characteristics that the other officers of Polish heritage did not share with him, such as his accent. *Cf. Hasham v. Cal. State Bd. of Equalization*, 200 F.3d 1035, 1050 (7th Cir. 2000) ("[A]ccent is generally recognized as a manifestation of national origin.").[3] Likewise, the defendants' argument that Egan treated a non-Polish officer, Walker, just as badly as he treated Wazny is similarly immaterial. The jury may ultimately credit that testimony, but the Court is required at this stage to give the non-moving plaintiff the benefit of any conflicts in the evidence. *See Gates v. Bd. of Educ. of City of Chi.*, 915 F.3d 631, 633 (7th Cir. 2019).

Wazny must also point to evidence from which a reasonable jury could conclude

---

[3] The defendants are correct that the Supreme Court has defined "national origin" for the purposes of Title VII to mean "the country from which you or your forebears came." *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 89 (1973). But the question at this stage is not whether Wazny shared a national origin with American-born officers of Polish heritage, but rather whether a reasonable jury could conclude that Egan treated Wazny differently because of *his* Polish national origin.

13

that Egan's conduct "was severe or pervasive enough to constitute a hostile work environment." *Gates*, 916 F.3d at 636. "Relevant to this inquiry are the severity of the alleged conduct, its frequency, whether it [wa]s physically threatening or humiliating (or merely offensive), and whether it unreasonably interfere[d] with the employee's work performance."[4] *Id.* (internal quotation marks omitted). As Wazny points out, however, the standard is disjunctive—the conduct need only be either severe or pervasive. *Id.* at 637.

Egan argues that Wazny has failed to carry his burden. Egan suggests that Wazny's testimony that he sometimes participated in joking with his coworkers about their backgrounds undermines his argument that the abuse he endured was severe or pervasive. In Egan's view, Wazny would not "have been a willing and energetic participant in the banter [he] now bemoans" if it were truly severe mistreatment. Defs.' Reply Br., dkt. no. 58, at 6. Egan also emphasizes that simple teasing and offhand comments are not actionable. *See, e.g.*, *Porter v. City of Chicago*, 700 F.3d 944, 956 (7th Cir. 2012). Egan further points to the list of allegations in Wazny's EEOC charge, which emphasized incidents when Egan became angry at Wazny but did not specifically identify the jokes or other explicitly national-origin-based mistreatment. In his view, that charge sets the perimeter of abuse the Court may consider in reviewing this motion.

Wazny emphasizes that even if the pattern of mistreatment he endured is not as severe as some of the cases cited by the defendants, it was pervasive and relentless.

---

[4] The Seventh Circuit has also held that a harasser's status a supervisor may raise otherwise marginal misconduct to the level of severity or pervasiveness necessary to support a hostile work environment claim. *See Gates*, 916 F.3d at 638. The Court concluded above that Egan was Wazny's coworker rather than a supervisor, however, so this consideration provides Wazny's claim no additional support.

14

He notes again that he testified that Egan subjected him to at least monthly Polish jokes in front of coworkers, often singled him out and spoke to him slowly as though he was dumb or unable to understand English, and made near-daily comments about his accent. The cumulative effect, he testified, was significant. He says he became withdrawn and had marital problems as a result of the stress and humiliation.

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" assessing a motion for summary judgment. *Anderson*, 477 U.S. at 455. Crediting Wazny's testimony, a reasonable jury could conclude that the mistreatment Egan subjected him to was severe or pervasive enough to constitute a hostile or abusive work environment. Egan, therefore, is not entitled to summary judgment.

### 2. Egan's defenses

Egan cursorily outlines two relevant defenses. First, in seven total lines across two briefs, he argues that he is qualifiedly immune. In Egan's view, there was no clearly established right not to be subjected to workplace harassment amounting to a hostile work environment that a reasonable official in his position should have been aware of. He is wrong. The Seventh Circuit has clearly and repeatedly held that it is a violation of a public employee's constitutional rights to subject him to a hostile work environment on the basis of his national origin. *See, e.g.*, *Alamo*, 864 F.3d at 549 n.16; *Huri v. Office of Chief Judge of Circuit Court of Cook Cty.*, 804 F.3d 826, 835 (7th Cir. 2015) ("Huri's Fourteenth Amendment right to be free from a hostile work environment was well-established by 2010, when [the named defendants] began supervising her."). "[F]reedom from arbitrary religion- and nationality-based discrimination had long been

15

illegal" by the time Egan acted.  *Huri*, 804 F.3d at 865.  Qualified immunity is thus no obstacle to Wazny's claim.  Egan's motion for summary judgment on this defense is denied.

Egan next argues that he is entitled to summary judgment on the basis that Wazny failed to mitigate his damages by timely reporting the mistreatment he now claims he suffered for nearly two years.  Egan concedes that that this defense relies on questions of fact and that he asks this Court to extend the law in his favor.  He then incorrectly asserts that, "[l]ike any issue of fact, a failure to mitigate only survives summary judgment if there are material facts from which a reasonable jury could infer either conclusion."  Pls.' Reply in Supp., dkt. no. 58, at 11.

Egan's mitigation argument fails.  As he acknowledges, there is no authority applying this defense in the present context.  That is perhaps unsurprising given the odd fit.  But even assuming the defense could apply, Egan fumbles the burden of proof.  As the defendant, it is Egan's burden to prove that the plaintiff failed to mitigate his damages.  *Cf. Brown v. Smith*, 827 F.3d 609, 616 (7th Cir. 2016) (applying failure-to-mitigate defense in the wrongful termination context); *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1048-49 (7th Cir. 1999) ("Failure to mitigate is an affirmative defense. The employer bears the burden of persuasion . . . .").  Therefore, to prevail Egan must "demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim."  *Hotel 71 Mezz Lender LLC v. Nat'l Retirement Fund*, 778 F.3d 593, 601 (7th Cir. 2015).  As discussed above, Wazny testified that he failed to report the harassment he says he endured because he was afraid of being labeled a snitch.  Egan has come nowhere near demonstrating that no reasonable jury

16

could credit Wazny's testimony.  Egan is thus not entitled to summary judgment on his mitigation defense.

## Conclusion

For the foregoing reasons, the Court grants the defendants' motion for summary judgment on the plaintiff's Title VII claim against the City of Chicago (count 1) and denies the motion on the plaintiff's section 1983 claim against Egan (count 2).  [dkt. no. 44].  The case is set for a status hearing on April 30, 2019 for the purpose of setting a trial date and discussing the possibility of settlement.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  April 19, 2019